

**Claim Form**

| | In the **High Court of Justice** |
|---|---|
| | **Queen's Bench Division** |
| | **Commercial Court** |
| | **Royal Courts of Justice** |

**NOT FOR SERVICE OUT OF THE JURISDICTION**

| | *for court use only* |
|---|---|
| Claim No. | CL-2017-000130 |
| Issue date | 1/3/17 |

Claimant(s)

LATIN AMERICAN INVESTMENTS LIMITED
(a company incorporated in the Isle of Man)

of Royalty House, Walpole Avenue, Douglas, IM1 2LT



Defendant(s)

(1)   MAROIL TRADING INC
      (a company incorporated in Panama)
(2)   SEA PIONEER SHIPPING CORPORATION
      (a company incorporated in Panama)

Name and address of Defendant receiving this claim form                                              £

MAROIL TRADING INC
SEA PIONEER SHIPPING CORPORATION

both of

53rd Street Marbella
World Trade Center, 5th Floor, Suite 502
Panama City
Republic of Panama

| Amount claimed | Money & Non-money claim |
|---|---|
| Court fee | £10528 |
| Legal representative's costs | To be assessed |
| Total amount | To be assessed |

The court office at the Admiralty and Commercial Registry, The Rolls Building, 7 Rolls Building, Fetter Lane, London, EC2A 1NL is open between 10 am and 4.30 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the claim number.

N1(CC) Claim form (CPR Part 7) (04.14)   This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection.  Contains public sector information licensed under the Open Government Licence v2.0

| | Claim No. | |
|---|---|---|

Brief details of claim

(1) In breach of trust and/or of fiduciary duty and/or in breach of agreements in writing dated 11 April 2006 and 13 December 2006 between (among others) the Claimant and the Defendants in relation to the joint venture companies Oceanic Oil Venture Inc and Hero Maritime Corp ("the VLCC JV Companies"), the Defendants have received, retained and/or dissipated US$10,000,0000, which was paid to them by Commerzbank AG pursuant to an agreement in writing between Commerzbank AG and the Second Defendant dated 10 February 2015.

(2) In breach of trust and/or of fiduciary duty and/or in breach of agreements in writing respectively with a date of 17 January 2005 and an effective date of 8 July 2003 between the Claimant and the First Defendant which relate to the joint venture companies Oil Carriers Limited, Bolivarian Petroleum Transport Limited ("BPT") and BPT's subsidiary Herculito Maritime Limited ("the Panamax JV Companies") and/or in breach of oral agreements between the Claimant and the First Defendant in relation to the Panamax JV Companies, the Defendants have received, retained and/or dissipated US$167,600,000, which was paid to them by PDVSA Petróleo S.A. ("PDVSA") pursuant to an agreement in writing between (among others) PDVSA and the Defendants dated 22 December 2014.

(3) Pursuant to the agreements between the Claimant and the First and/or Second Defendant referred to in (1) and (2) above and/or to an agreement in writing between the Claimant and the First Defendant dated 11 April 2006, the Claimant is entitled to disclosure of all documents in the Defendants' possession or control relating to the agreements referred to in (1) and (2), the payments made thereunder, the VLCC JV Companies and/or the Panamax JV Companies ("the Documents").

(4) The Claimant claims:

    a. an order that the Defendants pay and/or procure payment of the US$10,000,000 referred to in (1) above, or such proportion of it or such other sums as the Court thinks fit, plus interest, to the VLCC JV Companies, alternatively an order that the Defendants pay damages and/or equitable compensation and/or interest to the VLCC JV Companies;

    b. an order that the First Defendant pay or procure payment of the US$167,600,000 referred to in (2) above, or such proportion of it or such other sums as the Court thinks fit, plus interest, to the Panamax JV Companies, alternatively an order that the Defendants pay damages and/or equitable compensation and/or interest to the Panamax JV Companies;

    c. a declaration of the Claimant's legal and/or equitable rights and/or of the legal and/or equitable rights of the VLCC JV Companies and of the Panamax JV Companies in connection with the sums referred to in (1) and (2) above and/or in connection with the Defendant's failure to pay or procure payment of them to the VLCC JV Companies or the Panamax JV Companies;

    d. an order for disclosure of the Documents;

    e. the relief more fully particularised in the Particulars of Claim and further or other declaratory or other relief.

Particulars of claim attached

---

Statement of Truth

*The claimant believes that the facts stated in this claim form are true.

* I am duly authorised by the claimant to sign this statement

Full name      Andrew Preston

Name of claimant's ~~legal representa~~tive's firm    Clyde & Co LLP

signed _____    position or office held  Partner

Claimant's ~~legal represe~~ntative        (if signing on behalf of firm, company or corporation)

---

Clyde & Co LLP        Tel: 0207 876 5000    Claimant's or legal representative's address
St Botolph Building     Fax: 0207 876 5111    to which documents or payments should be
138 Houndsditch                       sent if different from overleaf including (if
London, EC3A 7AR.                   appropriate) details of DX, fax or e-mail.
Ref: LVR/AXP/0502080/003

Email: andrew.preston@clydeco.com
       lucinda.roberts@clydeco.com

Claim No._____

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN**

**LATIN AMERICAN INVESTMENTS LIMITED**

**Claimant**

0 1 MAR 2017

and

**(1) MAROIL TRADING INC**
**(2) SEA PIONEER SHIPPING CORPORATION**

**Defendants**

---

**PARTICULARS OF CLAIM**

---

**Section I: the Parties**

1.    The Claimant is a company incorporated under the laws of the Isle of Man.

2.    The First Defendant and the Second Defendant are companies incorporated under the laws of Panama.

3.    Mr Wilmer Ruperti Perdomo, who is a Venezuelan national and is known as Wilmer Ruperti, is the ultimate beneficial owner of the Defendants.

4.    The First Defendant is controlled by Mr Ruperti.

5.    The Second Defendant is controlled by the First Defendant and/or Mr Ruperti.

1

**Section II: the Joint Venture Companies and the Vessels**

6.   The Claimant and the First Defendant are equal shareholders in joint venture companies ("the JV Companies") that owned, or owned all of the shares in a company that owned, the tanker ships "Leander", "Hero 1", "Polar" and "Alloro" ("the JV Vessels") at all material times until their sale by mortgagees in possession.

*The "Leander"*

   6.1.   The "Leander" was owned by Oceanic Oil Venture Inc ("OOV"), a company incorporated under the laws of Panama.

   6.2.   OOV is a joint venture of the Claimant, the First Defendant and Oceanic Trans Shipping Est ("OTS"), each of which owns one third of its issued shares.

   6.3.   The "Leander" was mortgaged by OOV to Deutsche Schiffsbank Aktiengesellschaft ("DSB").

      6.3.1. DSB was a company incorporated under the laws of the Federal Republic of Germany.

      6.3.2. Pursuant to a merger by absorption in accordance with the laws of the Federal Republic of Germany, which became effective on 22nd May 2012, Commerzbank Aktiengesellschaft ("Commerzbank") is the successor of DSB and succeeded to all of the rights of DSB.

   6.4.   In or about November 2011, the "Leander" was sold by or on the instructions of DSB.

*The "Hero 1"*

   6.5.   The "Hero 1" was owned by Hero Maritime Corp ("HMC"), a company incorporated under the laws of the Marshall Islands.

   6.6.   HMC is a joint venture of the Claimant, the First Defendant and OTS, each of which owns one third of its issued shares.

   6.7.   The "Hero 1" was mortgaged by HMC to DSB.

6.8.   In or about June 2012, the "Hero 1" was sold by or on the instructions of Commerzbank.

*The "Polar"*

6.9.   Polar was owned by Herculito Maritime Limited ("Herculito"), a company incorporated under the laws of Liberia.

6.10.   Herculito is a wholly owned subsidiary of Bolivarian Petroleum Transport Limited ("BPT"), a company incorporated under the laws of the Isle of Man.

6.11.   BPT is a joint venture of the Claimant and the First Defendant, each of which owns one half of its issued shares.

6.12.   The "Polar" was mortgaged by Herculito to DSB.

6.13.   In or about August 2013, the "Polar" was sold by or on the instructions of Commerzbank.

*The "Alloro"*

6.14.   Alloro was owned by Oil Carriers Limited ("OCL"), a company incorporated under the laws of the Isle of Man

6.15.   OCL is a joint venture of the Claimant and the First Defendant, each of which owns one half of its issued shares.

6.16.   The "Alloro" was mortgaged by OCL to Lloyds TSB Bank plc ("Lloyds Bank").

6.17.   On or about 30th November 2011, "Alloro" was sold on the application of Lloyds Bank.

## Section III: the Employment of the Vessels and the PDVSA Contracts

7.   As more fully particularised below, at all material times until their repossession by mortgagees, the JV Vessels were employed wholly or in part, on charter to PDVSA Petróleo S.A. ("PDVSA"), a company in the Petróleos de Venezuela S.A. group of companies, under a series of contracts between the Defendants and/or companies beneficially owned and/or controlled by the First Defendant ("Maroil Companies"), as disponent owners, and PDVSA as charterers ("the PDVSA Contracts").

*The VLCCs: the COA*

8.   The "Leander" and the "Hero 1" (together "the VLCCs") were employed by PDVSA under a contract of affreightment dated 22nd March 2006 between the Second Defendant as disponent owner and PDVSA as charterer ("the COA").

   8.1.   By the COA, the Second Defendant agreed for reward to carry cargoes of crude oil and/or dirty petroleum products from ports to be nominated in Venezuela/ the Caribbean to ports to be nominated in the Far East.

   8.2.   The duration of the COA was a minimum of 5 years.

*The "Polar": time charter*

9.   The "Polar" was employed by PDVSA under a time charterparty evidenced by a fixture recap email dated 8th June 2005 but referring to a charterparty date of 2nd June 2005 between the First Defendant, alternatively a company owned and/or controlled by it, and PDVSA ("the Polar Charter").

   9.1.   The maximum charter period was 5 years.

   9.2.   The hire rate payable by PDVSA under the charterparty was US$30,500 per day or pro rata and a maximum of 1.7% Venezuelan freight tax and 1.25% commission to 'PDV Marina' were for the disponent owners' account.

10.   The Polar Charter named "Maroil Limited" as the owner of the "Polar" but in fact:

   10.1.   the vessel was, and remained throughout the currency of the Polar Charter, owned by Herculito;

   10.2.   the party in fact contracting as disponent owner with PDVSA was the First Defendant alternatively a company owned and/or controlled by the First Defendant.

*The "Alloro": time charter*

11.   The "Alloro" was employed by PDVSA under the following charterparties ("the Alloro Charters"):

11.1. initially, under a time charterparty of 3 years (plus 2 years in owners' option) between Suramericana de Transporte Petrolero C.A. ("Suramericana") as disponent owner and PDVSA as charterer dated 11th May 2004 ("the Suramericana/PDVSA Alloro Charter");

11.2. thereafter, under a 3 year time charterparty dated 18th July 2008 between LAP Shipping Inc. ("LAP") as disponent owner and PDVSA as charterer ("the LAP/PDVSA Alloro Charter").

12. Suramericana is a company incorporated under the laws of Venezuela.

12.1. As at 2004, Suramericana was a joint venture company between the Claimant and the First Defendant.

12.2. The First Defendant has since taken *de facto* control over Suramericana and its operations, such that the Claimant has no control over Suramericana.

12.3. Suramericana acts, and at all times material to this claim has acted:

12.3.1. only by persons employed by and/or under the direction and control of the First Defendant and/or Mr Ruperti and/or companies beneficially owned and/or controlled by the First Defendant and/or Mr Ruperti;

12.3.2. in accordance with the First Defendant's and/or Mr Ruperti's instructions.

13. The First Defendant and/or Mr Ruperti are the beneficial owners of LAP, which acts, and at all times material to this claim has acted:

13.1.1. only by persons employed by and/or under the direction and control of the First Defendant and/or Mr Ruperti and/or companies beneficially owned and/or controlled by the First Defendant and/or Mr Ruperti;

13.1.2. in accordance with the First Defendant's and/or Mr Ruperti's instructions.

**Section IV: Agreements between the Claimant and the Defendants**

14.    As more fully particularised below, the JV Vessels were employed under the PDVSA Contracts, and were permitted by the Claimant and the JV Companies to be so employed, on the understanding and agreement:

    14.1.  in the case of the VLCCs, of the Claimant and the Defendants, that the benefit of and all of the proceeds of the COA, including all monies paid by PDVSA under or in connection with COA, were to accrue to OOV and/or HMC ("the VLCC JV Companies") and were not to be retained by the Defendants, and that the Defendants would procure the same;

    14.2.  in the case of the "Polar" and the "Alloro" ("the Panamaxes"), of the Claimant and the First Defendant, that the benefit of and all of the proceeds of the PDVSA Contracts relating to the Panamaxes, including all monies paid by PDVSA under or in connection with such contracts, were to accrue to Herculito and/or OCL ("the Panamax JV Companies") and were not to be retained by the First Defendant or any other Maroil Companies concerned, and that the First Defendant would procure the same.

*Factual Matrix*

15.    In or about 2001, Mr Harry Sargeant Jr of the Claimant and Mr Ruperti discussed various business interests and possible future 50/50 joint ventures between them/ their companies.

16.    Those discussions included discussions relating to the acquisition of the tanker ship "General Zamora" and the possibility of exploiting commercial opportunities in the business of exporting and shipping crude and refined oil from Venezuela and elsewhere.  In particular, the possibility of acquiring vessels and profitably chartering them to PDVSA was discussed.

17.    The discussions culminated in a decision to enter a joint venture in relation to the "General Zamora" and the execution of a shareholders' agreement in relation to that ship's owner, Latin American Petroleum Transport Limited, on 10th October 2001.

18.    In its Amended Defence and Counterclaim and Additional Claim Against Part 20 Defendant dated 10th February 2012 in proceedings, between, amongst others, the Claimant and the First Defendant, in the High Court of Justice, Queen's Bench Division, Commercial Court bearing Claim Number 2010 Folio 877 ("the 2010 High Court Proceedings"), the First Defendant averred that in about October 2001 the Claimant and the First Defendant entered into an oral 'Overarching Agreement',

the terms of which included that the Claimant and the First Defendant would (by themselves, their servants or agents):

> *"(1)*      *act in the interests of each other and in their joint interests in connection with the joint venture activities that they would undertake;*
> *(2)*      *act towards each other in good faith; and*
> *(3)*      *refrain from any act, matter or thing likely to interfere with or harm the joint venture agreements into which they entered with each other".*

19. To the best of the Claimant's information and belief, there was no such 'Overarching Agreement' entered into in October 2001. However, at all material times, the continuing shared common understanding and expectation of the Claimant and the Defendants was that, unless otherwise agreed:

     19.1. Any particular joint ventures entered into between the Claimant and the First Defendant were to be owned by the Claimant and the First Defendant on an equal basis and all of the proceeds of any such venture would accrue to the ultimate benefit of the Claimant and the First Defendant on an equal basis.

     19.2. The First Defendant would use its best endeavours to charter any joint venture vessels (including in particular the Vessels) to PDVSA on favourable terms, subject to the Claimant's agreement.

     19.3. For Venezuelan commercial, legal or political reasons, the disponent owners under any such charters (including in particular the PDVSA Contracts) would be the Defendants or other Maroil Companies.

     19.4. The joint venture companies concerned (including in particular the JV Companies) would make the joint venture vessels concerned (including in particular the JV Vessels) available to the Defendants and/or any other Maroil Companies concerned to perform any such charters (including in particular the PDVSA Contracts).

     19.5. The proceeds of any such charters (including the PDVSA Contracts), including all monies paid by PDVSA under or in connection with them, were to accrue to the benefit of the joint venture companies concerned (including in particular the JV Companies) and were not to retained by the Defendants or any other Maroil Companies concerned, and the First Defendant would procure the same.

*The "Leander"*

20.   By a Shareholders' Agreement dated 11ᵗʰ April 2006 ("the OOV Shareholders' Agreement"), the
      Claimant, the Defendants, OTS and OOV agreed as follows.

      *"5 Business of the Company*
      *5.1 The business of the Company* [defined as OOV] *shall be that of:*
      *5.1.1       owning and operating the Vessel* [defined as the "Leander"] *and chartering vessels in*
      *            order to perform the PDVSA Contract* [defined as the COA]*; and*
      *5.1.2       operating the PDVSA contract.*

      *5.2         Each Shareholder* [defined as the Claimant, the First Defendant and OTS] *shall use its*
      *            reasonable endeavours to promote and develop the business of the Company to the best*
      *            advantage of the Company ...*

      *5.4         Sea Pioneer* [i.e. the Second Defendant] *hereby confirms and acknowledges that its*
      *            rights, title and benefits in and to the PDVSA Contract are hereby deemed to be assigned*
      *            to the Company and that Sea Pioneer shall hold its rights, title and interest in and to the*
      *            PDVSA Contract on trust for the Company and shall at all times during the period of the*
      *            PDVSA Contract act as agent and trustee for and on behalf of the Company in the*
      *            performance of the PDVSA Contract, including bringing any claim against PDVSA for*
      *            damages for breach of contract by PDVSA ...*

      *11  Duration, termination and consequences of termination*
      *11.1        Subject as otherwise provided in this Agreement, this Agreement shall continue in full*
      *            force and effect without limit in point of time and until the Shareholders agree in writing*
      *            to terminate this Agreement or until an effective resolution is passed or a binding order*
      *            is made for the winding up of the Company, whichever is earlier ...*

      *14  Rights to information and confidentiality*
      *14.1        The Parties shall ensure that each Shareholder and its authorised representatives shall*
      *            be allowed access at all reasonable times and on reasonable notice to examine and copy*
      *            all documents and all and any books and records of the Company.*

      *16  Parties Bound ...*
      *16.2        The Shareholders undertake with each other to exercise their powers in relation to the*
      *            Company so as to ensure that the Company fully and promptly observes, performs and*
      *            complies with its obligations under this Agreement and to exercise their rights as*
      *            Shareholders in a manner consistent with this Agreement ...*

      *22  Further assurance*
      *            Each of the Parties shall, and shall use their respective reasonable endeavours to*
      *            procure that any necessary third Parties shall, execute and deliver to the other Parties*
      *            such other instruments and documents and take such other action as may be required to*
      *            carry out, evidence and confirm the provisions of this Agreement and Articles ..."*

21.   On the true construction of clauses 5.2 and/or 16 and and/or 22 of the OOV Shareholders'
      Agreement and/or by reason of a term to be implied into it to give it business efficacy and/or to
      reflect the obvious but unexpressed intentions of the parties, the Claimant, the Defendants and OTS
      agreed not to do, cause or suffer to be done, and not to cause or permit any company or other

person under their control to do, any act, matter or thing likely to interfere with or harm the business of OOV or the other shareholders.

22.     In accordance with the understanding and expectation averred at paragraph 19 above and with clause 5.4 of the OOV Shareholders' Agreement, with the knowledge and agreement of the Claimant and the Defendants:

22.1.  OOV made the "Leander" available to the Second Defendant to perform the COA.

22.2.  By a loan agreement dated 11th April 2006 between OOV and DSB, amongst others ("the Leander Loan Agreement"), OOV agreed that all moneys whatsoever payable to the Second Defendant arising out of the use or operation of the "Leander" were to be payable to OOV (in particular to OOV's Earnings Account with DSB).

22.3.  By an agreement dated 12th April 2006 between the Second Defendant and DSB entitled "COA Assignment relating to m.t. "LEANDER"", the Second Defendant agreed to assign all its rights and interest in the COA to DSB as security for OOV's obligations under the Leander Loan Agreement.

*The "Hero 1"*

23.     By a Shareholders' Agreement dated 13th December 2006 ("the HMC Shareholders' Agreement"), the Claimant, the Defendants, OTS, and HMC agreed as follows.

> *"5 BUSINESS OF THE COMPANY*
> *5.1        The business of the Company* [defined as HMC] *shall be that of:*
> *5.1.1      owning and operating the Vessel* [defined as the "Hero 1"] *and chartering vessels in order to perform the PDVSA Contract* [defined as the COA]; *and*
> *5.1.2      operating the PDVSA contract.*
>
> *5.2        Each Shareholder* [defined as the Claimant, the First Defendant and OTS] *shall use its reasonable endeavours to promote and develop the business of the Company to the best advantage of the Company ...*
>
> *5.4        Sea Pioneer* [i.e. the Second Defendant] *hereby confirms and acknowledges that its rights, title and benefits in and to the PDVSA Contract are hereby deemed to be assigned to the Company and that Sea Pioneer shall hold its rights, title and interest in and to the PDVSA Contract on trust for the Company and shall at all times during the period of the PDVSA Contract act as agent and trustee for and on behalf of the Company in the performance of the PDVSA Contract, including bringing any claim against PDVSA for damages for breach of contract by PDVSA...*
>
> *11  DURATION, TERMINATION AND CONSEQUENCES OF TERMINATION*

9

*11.1      Subject as otherwise provided in this Agreement, this Agreement shall continue in full force and effect without limit in point of time and until the Shareholders agree in writing to terminate this Agreement or until an effective resolution is passed or a binding order is made for the winding up of the Company, whichever is earlier ...*

*14  RIGHTS TO INFORMATION AND CONFIDENTIALITY*
*14.1      The Parties shall ensure that each Shareholder and its authorised representatives shall be allowed access at all reasonable times and on reasonable notice to examine and copy all documents and all and any books and records of the Company.*

*16  PARTIES BOUND ...*
*16.2      The Shareholders undertake with each other to exercise their powers in relation to the Company so as to ensure that the Company fully and promptly observes, performs and complies with its obligations under this Agreement and to exercise their rights as Shareholders in a manner consistent with this Agreement ...*

*22  FURTHER ASSURANCE*
*Each of the Parties shall, and shall use their respective reasonable endeavours to procure that any necessary third Parties shall, execute and deliver to the other Parties such other instruments and documents and take such other action as may be required to carry out, evidence and confirm the provisions of this Agreement and Articles ..."*

24.   On the true construction of clauses 5.2 and/or 16 and and/or 22 of the HMC Shareholders' Agreement and/or by reason of a term to be implied into it to give it business efficacy and/or to reflect the obvious but unexpressed intentions of the parties, the Claimant, the Defendants and OTS agreed not to do, cause or suffer to be done, and not to cause or permit any company or other person under their control to do, any act, matter or thing likely to interfere with or harm the business of HMC or the other shareholders.

25.   In accordance with the understanding and expectation averred at paragraph 19 above and with clause 5.4 of the HMC Shareholders' Agreement, with the knowledge and agreement of the Claimant and the Defendants:

25.1. HMC made the "Hero 1" available to the Second Defendant to perform the COA.

25.2. By a loan agreement dated 11th December 2006 between HMC and DSB, amongst others ("the Hero 1 Loan Agreement"), HMC agreed that all moneys whatsoever payable to the Second Defendant arising out of the use or operation of the "Hero 1" were to be payable to HMC (in particular to HMC's Earnings Account with DSB).

25.3. By an agreement dated 13th December 2006 between the Second Defendant and DSB, the Second Defendant agreed to assign all its rights and interest in the COA to DSB as security for HMC's obligations under the Hero 1 Loan Agreement.

*The "Polar"*

26.   By an undated Shareholders' Agreement which refers to an 'Effective Date' of 8th July 2003 ("the BPT Shareholders' Agreement"), the Claimant, as the 'A' Shareholder of BPT, and the Defendant, as the 'B' Shareholder of BPT, entered into a shareholders' agreement in writing in respect of BPT, referred to in the Agreement as "the Company".

27.   The BPT Shareholders' Agreement, to which the Claimant will refer as necessary for its full terms, meaning and effect, included the following among other express terms:

   *"WHEREAS ...*

   *B.        The issued capital of the Company comprises two Pounds Sterling divided into two shares of one Pound Sterling and each share has been beneficially owned or registered in the name of the A Shareholder and the B Shareholder in equal numbers since the effective date.*

   *C.        The Parties have agreed that their relations and the affairs of the Company and their subsidiaries from time to time should be regulated in the manner hereinafter appearing with effect from the effective date of this agreement ...*

   *2.  Purpose*
   *2.1        The Company conducts or intends to conduct the business of owning and operating ships for the carriage of petroleum products worldwide within insurance limits and holding share in ship owning/ operating companies.*

   *2.2        Neither Party will at any time (whether or not it remains a Shareholder of the Company)*
              *...*
   *            (b)      do any act, matter or thing likely to interfere with or harm the Company's business or the other Party ...*

   *8.  Termination and Call Options*
   *8.1        This Agreement will continue in force until the winding up of the Company or until terminated by agreement between the Parties.*

   *8.2        Any termination of this Agreement will be without prejudice to the accrued rights of any Party ...*

   *9.  General Provisions*
   *9.1        The provisions of this Agreement will apply* mutatis mutandis *to any subsidiary from time to time of the Company."*

28.   Further, on the true construction of clause 2.2 and/or 9.1 of the BPT Shareholders' Agreement and/or by reason of a term to be implied into it to give it business efficacy and/or to reflect the obvious but unexpressed intentions of the parties, the Claimant and the First Defendant agreed not to cause or permit any company or other person under their control to do any act, matter or thing likely to interfere with or harm BPT's business or the business of any subsidiary of BPT or the other Party.

29.  In accordance with the understanding and expectation averred at paragraph 19 above, with clauses 2.2 and 9.1 of the BPT Shareholders' Agreement and with the term averred at paragraph 28 above, with the knowledge and agreement of the Claimant and the First Defendant:

29.1.  BPT and Herculito made the "Polar" available to the First Defendant and/or Maroil Companies to perform the Polar Charter.

29.2.  By a loan agreement dated 26 May 2006 between Herculito and DSB and/or an agreement dated 10th June 2006 between Herculito and DSB entitled "GENERAL ASSIGNMENT relating to m.v, "POLAR", Herculito agreed that all moneys whatsoever payable to Herculito arising out of the charter, use or operation of the "Polar" were to be payable to Herculito's Earnings Account with DSB.

29.3.  In circumstances where Herculito was not chartering to PDVSA directly or in a direct contractual relationship with PDVSA, it was agreed between the Claimant and the First Defendant that all monies received from PDVSA arising out of or in connection with the charter of the "Polar" to PDVSA would, after the deduction of any legitimate expenses (as to which, paragraph 9.2 above is repeated), be paid to Herculito and that the Claimant and the First Defendant would do all things necessary and appropriate so to ensure.

*The "Alloro"*

30.  By a Shareholders' Agreement dated 17th January 2005 ("the OCL Shareholders' Agreement"), the Claimant, as the 'A' Shareholder of OCL, and the First Defendant, as the 'B' Shareholder of OCL, entered into a shareholders' agreement in writing in respect of OCL, referred to therein as "the Company".

31.  The OCL Shareholders' Agreement, upon which the Claimant will rely as necessary for its full terms, meaning and effect included the following among other express terms:

*"WHEREAS ...*
*B.       The issued capital of the Company comprises $2.00 United States currency divided into two shares of $1.00 each registered in the name of the A Shareholder and the B Shareholder in equal numbers.*

*C.       The Parties have agreed that their relations and the affairs of the Company and their subsidiaries from time to time shall be regulated in the manner hereinafter appearing ...*

12

2.      *Purpose*

2.1     *The Company conducts or intends to conduct the business of owning and operating ships for the carriage of petroleum products on the Venezuelan / Netherlands Antilles cabotage trade and/or worldwide within insurance limits.*

2.2     *Neither Party will at any time (whether or not it remains a Shareholder of the Company)*

      ...

      (b)     *do any act, matter or thing likely to interfere with or harm the Company's business or the other Party ...*

8.  *Termination and Call Options*

8.1     *This Agreement will continue in force until the winding up of the Company or until terminated by agreement between the Parties.*

8.2     *Any termination of this Agreement will be without prejudice to the accrued rights of any Party ..."*

32.  Further, on the true construction of clause 2.2 of the OCL Shareholders' Agreement and/or by reason of a term to be implied into it to give it business efficacy and/or to reflect the obvious but unexpressed intentions of the parties, the Claimant and the First Defendant agreed not to cause or permit any company or other person under their control to do any act, matter or thing likely to interfere with or harm OCL's business or the other Party.

33.  In accordance with the understanding and expectation averred at paragraph 19 above, with clause 2.2 of the OCL Shareholders' Agreement and with the term averred at paragraph 32 above, with the knowledge and agreement of the Claimant and the First Defendant:

    33.1.  By a charterparty dated 17th December 2004, OCL bareboat chartered "Alloro" to Suramericana for a maximum period of 5 years and at a daily hire rate of US$18,000 ("the Alloro Bareboat Charter").

    33.2.  By a loan agreement dated 26th May 2006 between OCL and Lloyds Bank ("the Alloro Loan Agreement"), OCL agreed that all monies whatsoever payable to OCL and/or Suramericana arising out of the charter, use or operation of the "Alloro" were to be payable to OCL's Earnings Account with Lloyds Bank.

    33.3.  In circumstances where OCL was not chartering to PDVSA directly, nor in a direct contractual relationship with PDVSA, it was agreed between the Claimant and the First Defendant that all monies received from PDVSA arising out of or in connection with the charter of the "Alloro" to PDVSA would, after the deduction of any legitimate expenses, be paid to OCL and that the Claimant and the First Defendant would do all things necessary and appropriate so to ensure.

13

33.4.  Suramericana and/or the First Defendant and/or the Maroil Companies concerned having for a time failed to pay or procure the payment all of the earnings of "Alloro" under the LAP/PDVSA Alloro Charter into OCL's Earnings Account with Lloyds Bank in a timely fashion, OCL and Suramericana entered into an agreement in writing dated 16th September 2010 entitled "Addendum No 1 to bareboat charter dated 17th December 2004" ("the Alloro Bareboat Addendum").

33.5.  The Alloro Bareboat Addendum, provided inter alia that:

> *"Suramericana hereby undertakes to ensure that all and any hire due and payable by PDVSA to Lap under the sub sub time charter (US$31,000 per day) is paid in full and without deduction and direct by PDVSA to Oil Carriers' account with Lloyds Bank and that they will make no claim for hire against Lap under their sub time charter."*

34.  The Claimant will refer as necessary to the agreements averred in these Particulars of Claim for their full terms, meaning and effect.

## Section V: disputes between the parties and claims against PDVSA

35.  By 2010, disputes had arisen between the Claimant and the First Defendant.

36.  The Claimant commenced the 2010 High Court Proceedings against the First Defendant. OTS subsequently joined those proceedings as an additional claimant.

37.  Further, the VLCC JV Companies commenced an arbitration against PDVSA under the COA ("the First PDVSA Arbitration") and served Claim Submissions in August 2011. The claims concerned (inter alia) PDVSA's failure to nominate or perform the minimum number of shipments required under the COA and

37.1.  The VLCC JV Companies relied upon clause 5.4 of the OOV Shareholders' Agreement and of the HMC Shareholders' Agreement ("the VLCC Shareholders'Agreements") as giving them standing to bring the claim.

37.2.  They claimed US$110,371,978 in damages in respect of PDVSA's breaches of the COA (later revised to US$106,468,023).

38.  On or about 9th August 2012, without informing the Claimant or the JV Companies, the Defendants and Mr Ruperti wrote a letter to PDVSA ("the August 2012 Letter of Claim") claiming US$580

million in respect of PDVSA's failure to perform the PDVSA Contracts and failure to perform agreements relating to two additional vessels, the tankers "General Zamora" and "Almirante Brion" ("the Other Vessels").

39.  On 17th December 2013, solicitors acting for Commerzbank wrote to the tribunal in the First PDVSA Arbitration asserting amongst other things that Commerzbank was the assignee of the Second Defendant's rights under the COA and that Commerzbank, not the VLCC JV Companies, had the right to pursue the claim against PDVSA under the COA.

40.  On 7th February 2014, the Claimant, the First Defendant and OTS agreed to settle the 2010 High Court Proceedings. On 11th February 2014, the Court approved a Tomlin Order giving effect to the settlement.

41.  On 30th April 2014, Commerzbank commenced an arbitration against PDVSA ("the Second PDVSA Arbitration"), asserting a claim under the COA on the basis that it was the assignee of the Second Defendant's rights under the COA.

42.  By written resolutions of their boards dated 1st May 2014 ("the May 2014 Board Resolutions"), the VLCC JV Companies authorised Mr Patrick Mooney and Mr Ruperti to represent them in discussions with PDVSA to explore the settlement of their claims in the First PDVSA Arbitration.

   42.1.  These resolutions had the support of all of the shareholders of the VLCC JV Companies.

   42.2.  The resolutions made clear that Mr Mooney and Mr Ruperti had no authority to conclude any settlement and that their authority was to conduct negotiations in good faith and present to the boards of the VLCC JV Companies details of any settlement proposals made by PDVSA.

   42.3.  Pursuant to the May 2014 Board Resolutions, the VLCC JV Companies issued letters of authority dated 1st May 2014 to Mr Mooney and Mr Ruperti ("the May 2014 Letters of Authority").

   42.4.  Mr Mooney and Mr Ruperti agreed to act as agents on behalf of the VLCC JV Companies in negotiations with PDVSA in accordance with the terms of the May 2014 Board Resolutions and the May 2014 Letters of Authority.

43.  PDVSA did not appear or take any step in either the First PDVSA Arbitration or, insofar as the Claimant is aware, the Second PDVSA Arbitration ("the PDVSA Arbitrations").

44.   Between September and November 2014, there were discussions between the shareholders of the VLCC JV Companies and Commerzbank with a view to with a view to agreeing a settlement proposal, acceptable both to Commerzbank and to the shareholders of the VLCC JV Companies, that could be put to PDVSA in relation to the PDVSA Arbitrations.

45.   In an email dated 18th November 2014 from Mr Christiane Goonatilleka of Commerzbank to Mr Mooney, Commerzbank indicated that:

45.1.   It was not prepared to accept any settlement that would deliver less than US$20 million to the banks (i.e. the syndicate of lenders, including Commerzbank, to the VLCC JV Companies).

45.2.   Its position was that any settlement with PDVSA would have to be negotiated through the Second Defendant (PDVSA's contractual counterparty under the COA).

45.3.   It had informed Mr Ruperti of that and Mr Ruperti had informed Commerzbank that he was happy to negotiate such a settlement between the banks and PDVSA.

45.4.   If the other shareholders (i.e. the Claimant and OTS) wished to continue to discuss settlement with Commerzbank, they should do so through Mr Ruperti.

46.   In December 2014, PDVSA and the Defendants, acting by or on the instructions of Mr Ruperti, held negotiations with PDVSA in Caracas, Venezuela in relation to settlement. As addressed below, settlements were reached with PDVSA both in relation to the PDVSA Arbitrations and in relation to the August 2012 Letter of Claim and the PDVSA Contracts. However, the Defendants and Mr Ruperti concealed the settlements, and their proceeds, from the Claimant and JV Companies.

## Section VI: the Payment Agreement, the COA Settlement, the Commission Agreement and the Settlement Proceeds

47.   By agreements dated 22nd December 2014, which were made by the Defendants without the knowledge or consent of the Claimant or the JV Companies, the Defendants settled with PDVSA all and any claims arising out of or in connection with the PDVSA Contracts.

47.1.   By an agreement in writing dated 22nd December 2014 – which the Claimant has not seen but which is referred to in Recital E of an agreement in writing dated 10th February 2015

between the Second Defendant and Commerzbank entitled "Commission Agreement" ("the Commission Agreement") – PDVSA agreed to pay US$30 million to the First and/or Second Defendant or their order in full and final settlement of the claims made in the PDVSA Arbitrations and of all disputes under the COA ("the COA Settlement").

47.2.  By a further agreement in writing in the Spanish language dated 22nd December 2014, between PDVSA, the Defendants and Intercontinental View Inc of Panama ("Intercontinental") entitled (in translation) Payment Agreement and Waiver of Claims ("the Payment Agreement"), PDVSA agreed to pay US$230 million in consideration of the waiver any rights or claims whatsoever linked to unnamed "Panamax" and "Aframax" vessels time chartered by the Defendants to PDVSA.

48.  In accordance with the COA Settlement, on 30th January 2015 PDVSA paid US$30 million ("the COA Settlement Proceeds") into a bank account with Commerzbank named in the COA Settlement.

49.  By the Commission Agreement, Commerzbank agreed to pay the Second Defendant, by way of a payment to a numbered bank account in the name of the First Defendant with Sparkasse Schwyz, a Swiss bank ("the Sparkasse Bank Account") a "commission" of US$10 million ("the Commission Payment") as soon as reasonably practicable following the receipt of the COA Settlement Proceeds.

50.  The Commission Payment was paid by Commerzbank into the Sparkasse Bank Account on or about 12th February 2015.

51.  In the Commission Agreement, the Commission Payment was stated to be in respect of, amongst other things, the Second Defendant's *"settlements of any claims as between* [the Second Defendant] *and the other two shareholders in* [HMC] *and* [OOV]*"*, i.e. the Claimant and OTS. In fact, there was no such settlement and as particularised below the COA Settlement, the Commission Agreement, the payment of the COA Settlement Proceeds and the payment of the Commission Payment were concealed from the Claimant and from the JV Companies.

52.  The vessels and time charterparties to which the Payment Agreement relates are not specifically identified in the Payment Agreement   However, a recital to the Payment Agreement referred in particular to *"the claim submitted on August 9th, 2012"*, which the Claimant understands to be a reference to the August 2012 Letter of Claim.  It is a fair inference to draw that the consideration for the payments required of PDVSA by the Payment Agreement was the waiver of actual or

potential claims in connection with charters to PDVSA of the vessels identified in the August 2012 Letter of Claim, being:

    52.1.  the Panamax and Aframax vessels referred to therein, namely "Alloro", "Polar", "General Zamora" and "Alimirante Brion"; and

    52.2.  insofar as "Alloro" and "Polar" are concerned, the PDVSA Contracts relating to those vessels.

53.    It appears from a recital to the Payment Agreement that the Defendants had purported to assign or otherwise transferred part of their "litigious rights" against PDVSA to Intercontinental. Which vessels and contracts those purportedly transferred litigious rights related to is not stated.

54.    The Payment Agreement provided for the payment of the US$230 million settlement sum ("the Total Panamax Settlement Sum") by way of a number of instalments totalling US$167,600,000 ("the Payment Agreement Proceeds") to the First Defendant's Sparkasse Bank Account, with the balance of US$62,400,000 to be paid by instalments to Intercontinental. Under the terms of the Payment Agreement, payment of all sums payable by PDVSA under the agreement was to be made by no later than 30th May 2015.

55.    To the best of the Claimant's information and belief, the Payment Agreement Proceeds were paid by or on behalf of PDVSA to the Spakasse Bank Account and to Intercontinental's Bank Account.

56.    As particularised below, the Payment Agreement and the payment of the Payment Agreement Proceeds were also concealed from the Claimant.

57.    The Commission Payment and the Payment Agreement Proceeds (together "the Settlement Proceeds") have been treated by the First Defendant and/or the Second Defendant as if received to their own use and have been dissipated at least in part.

58.    The Defendants, acting by Mr Ruperti, concealed the COA Settlement, the Payment Agreement, the Commission Agreement, the Commission Payment and the Payment Agreement Proceeds from the Claimant and from the Joint Venture Companies.

    58.1.  The Defendants failed to inform the Claimant or the JV Companies of the COA Settlement, the Payment Agreement, the Commission Agreement, the Commission Payment or the Payment Agreement Proceeds.

58.2.  The Defendants, through Mr Ruperti, falsely, dishonestly and in bad faith, represented to Mr Mooney, and through him to the Claimant, orally on several occasions between February and May 2015, that a settlement with PDVSA had not yet been reached by the Defendants. Mr Mooney reported this orally to the Claimant.  In the alternative, insofar as Mr Ruperti informed Mr Mooney of the true position, he did so on terms that Mr Mooney should, and procured that Mr Mooney did, represent to the Claimant, falsely, dishonestly and in bad faith, that a settlement with PDVSA had not yet been reached by the Defendants.

58.3.  In fact, as the Defendants (through Mr Ruperti) knew, the Defendants (acting through Mr Ruperti and/or as directed by him) had agreed the COA Settlement and the Payment Agreement with PDVSA, the COA Settlement Proceeds had been paid to Commerzbank, the Commission Payment had been paid to the Sparkasse Bank Account and the Payment Agreement Proceeds (or part of them) had been paid to the Sparkasse Bank Account.

58.4.  Mr Dan Sargeant, Mr Ruperti and Mr Mooney met at the Four Seasons Hotel in Geneva on 1st June 2015.  A lawyer acting for Mr Ruperti was also present at the meeting.  In the course of the meeting, the Defendants (through Mr Ruperti), falsely, dishonestly and in bad faith, represented to Mr Sargeant that a settlement with PDVSA had not yet been reached by the Defendants.  Paragraph 58.3 above is repeated.

58.5.  On or about 8 October 2015, the Defendants, through Mr Ruperti, again, falsely, dishonestly and in bad faith, represented orally to Mr Mooney, and through him to the Claimant, that a settlement with PDVSA had not yet been reached by the Defendants.  Mr Mooney reported this orally to the Claimant.  In the alternative, insofar as Mr Ruperti informed Mr Mooney of the true position, he did so on terms that Mr Mooney should, and procured that Mr Mooney did, represent to the Claimant, falsely, dishonestly and in bad faith, that a settlement with PDVSA had not yet been reached by the Defendants.  Paragraph 58.3 above is repeated.

58.6.  In January 2016, the Defendants, through Mr Ruperti, again, falsely, dishonestly and in bad faith, represented orally to Mr Mooney, and through him to the Claimant, that a settlement with PDVSA had not yet been reached by the Defendants.  Mr Mooney reported this orally to the Claimant.  In the alternative, insofar as Mr Ruperti informed Mr Mooney of the true position, he did so on terms that Mr Mooney should, and procured that Mr Mooney did, represent to the Claimant, falsely, dishonestly and in bad faith, that a settlement with PDVSA had not yet been reached by the Defendants.  Paragraph 58.3 above is repeated.

**Section VII: claims**

*VLCCs*

59.    Pursuant to clauses 5.4 and/or 16 and/or 22 of the VLCC Shareholders' Agreements and/or to the
       terms referred to at paragraphs 21 and 24 above, the Defendants were in a position of trust and
       confidence as trustees, agents and/or intermediaries between the VLCC JV Companies and
       PDVSA and owed to the VLCC JV Companies and/or to the Claimant contractual and/or fiduciary
       duties:

       59.1.  to act honestly and in good faith in the interests of the VLCC JV Companies and/or its
              shareholders and/or to procure that companies under their control should do them same;

       59.2.  of loyalty and to avoid any conflict of interest;

       59.3.  not to make any profit from, or take any commission arising out of, the use of their position
              of trust and confidence without the fully informed consent of the VLCC JV Companies.

60.    In the premises, in breach of clauses 5.2, 5.4 and/or 22 of the VLCC Shareholders' Agreements, of
       the terms referred to at paragraphs 21 and 24 above and of the duties referred to at paragraph 59
       above, the Defendants:

       60.1.  without the knowledge, authority or consent of the Claimant or the VLCC JV Companies
              agreed the COA Settlement with PDVSA and the Commission Agreement with
              Commerzbank;

       60.2.  failed to inform the Claimant or the VLCC JV Companies of, and failed to obtain the
              consent of the Claimant and the VLCC JV Companies to, the COA Settlement, the
              Commission Agreement and the Commission Payment and concealed them from the
              Claimant and the VLCC JV Companies;

       60.3.  made secret arrangements to receive and received the Commission Payment and dealt with it
              as their own, dissipated it and failed to pay it or any of it to the VLCC JV Companies;

       60.4.  failed to use reasonable endeavours to promote and develop the business of the VLCC JV
              Companies to the best advantage of the VLCC JV Companies and instead used claims
              against PDVSA under the COA, to the benefit of which the VLCC JV Companies were
              entitled, for their own benefit;

20

60.5. failed to, and/or failed to exercise their reasonable endeavours to procure that any necessary third parties should, execute and deliver instruments and documents, and to take such other action required, to ensure that the Commission Payment was paid to the VLCC JV Companies;

60.6. interfered with and/or harmed the VLCC JV Companies' business and/or the Claimant, and/or caused or permitted companies under their control to do the same in the manner stated at paragraphs 60.1 to 60.5 above.

61.   In the premises, the Defendants:

61.1. hold the Commission Payment, its traceable proceeds and/or any profits made from the use of the same on trust for the VLCC JV Companies;

61.2. are obliged and/or liable to pay the Commission Payment, its traceable proceeds and/or any profits made from the use of the same to the VLCC JV Companies;

61.3. are obliged and/or liable to account to the VLCC JV Companies for the Commission Payment and any profits made from the use of the same;

61.4. are liable to pay a sum equivalent in amount to the Commission Payment, any profits made from the use of the same and/or equitable compensation and/or damages to the VLCC JV Companies.

62.   In the premises, the Claimant seeks the following relief:

62.1. Declarations of the matters averred at paragraph 61 above;

62.2. An order that an inquiry be made, and an account be taken, in relation to the Commission Payment, its traceable proceeds and any profits made from the use of the same;

62.3. An order that the Defendants do pay or procure payment of the Commission Payment, its traceable proceeds and any profits made from the use of the same, together with interest thereon, to the VLCC JV Companies;

62.4. Further or in the alternative, an order that the Defendants do pay a sum equivalent in amount to the Commission Payment and any profits made from the use of the same and/or equitable compensation and/or damages, together with interest thereon, to the VLCC JV Companies.

*Polar*

63. Pursuant to the agreement referred to at paragraph 29.3 above and/or to clauses 2.2 and/or 9.1 of the BPT Shareholders' Agreement and/or to the term averred at paragraph 28 above, the First Defendant was in a position of trust and confidence as a trustee, agent and/or intermediary between, on the one hand, BPT and Herculito, and, on the other hand, PDVSA, and owed to BPT, Herculito and/or to the Claimant contractual and/or fiduciary duties:

   63.1. to pay or procure the payment of all monies (net of any legitimate expenses) received from PDVSA, arising out of or in connection with the charter of the "Polar" to PDVSA, to Herculito;

   63.2. to act honestly and in good faith in the interests of BPT and Herculito and/or to procure that companies under its control should do them same;

   63.3. of loyalty and to avoid any conflict of interest;

   63.4. not to make any profit from the use of its position of trust and confidence without the fully informed consent of BPT and/or Herculito.

64. In the premises, in breach of clause 2.2 of the BPT Shareholders' Agreement, of the term referred to at paragraph 28 above, of the duties referred to at paragraph 63 above and/or of the agreement referred to at paragraph 29.3 above, the First Defendant:

   64.1. without the knowledge, authority or consent of the Claimant, BPT or Herculito, agreed the Payment Agreement with PDVSA;

   64.2. failed to inform the Claimant, BPT or Heculito of, and failed to obtain the consent of the Claimant, BPT and Herculito to, the Payment Agreement and the payment of the Payment Agreement Proceeds, and concealed them from the Claimant, BPT and Herculito;

   64.3. made secret arrangements to receive and received the Payment Agreement Proceeds and dealt with them as its own, dissipated them and failed to pay any of them to Herculito;

   64.4. interfered with and/or harmed BPT's and/or Herculito's business and/or the Claimant, and/or caused or permitted companies under their control to do the same in the manner stated at paragraphs 64.1 to 64.3 above.

65.    In the premises, the First Defendant:

      65.1.  holds one quarter of the Total Panamax Settlement Sum, alternatively another proportion –
           to be assessed after disclosure, the making of inquiries and/or the taking of accounts – of the
           Total Panamax Settlement Sum and/or one quarter, alternatively another proportion, of the
           Payment Agreement Proceeds, their traceable proceeds and/or any profits made from the use
           of the same on trust for Herculito ("the Herculito Trust Property");

      65.2.  is obliged and/or liable to pay the Herculito Trust Property to Herculito;

      65.3.  is obliged and/or liable to account to Herculito for the Herculito Trust Property;

      65.4.   is liable to pay a sum equivalent in amount to the Herculito Trust Property and/or equitable
           compensation and/or damages to Herculito.

66.    In the premises, the Claimant seeks the following relief:

      66.1.  Declarations of the matters averred at paragraph 65 above;

      66.2.  An order that an inquiry be made, and an account be taken, in relation to the Herculito Trust
           Property;

      66.3.  An order that the First Defendant do pay and/or procure payment of the Herculito Trust
           Property, together with interest thereon, to Herculito;

      66.4.  Further or in the alternative, an order that the First Defendant do pay a sum equivalent in
           amount to the Herculito Trust Property and/or equitable compensation and/or damages,
           together with interest thereon, to Herculito.

*Alloro*

67.    Pursuant to the agreement referred to at paragraph 33.3 above and/or to clause 2.2 of the OCL
      Shareholders' Agreement and/or to the term averred at paragraph 32 above, the First Defendant
      owed to the Claimant a duty to pay or procure the payment of all monies (net of any legitimate
      expenses) received from PDVSA, arising out of or in connection with the charter of the "Alloro" to
      OCL.

68.   In the premises, in breach of clause 2.2 of the OCL Shareholders' Agreement, of the term referred to at paragraph 32 above, of the duties referred to at paragraph 67 above and/or of the agreement referred to at paragraph 33.3 above, the First Defendant:

    68.1.   received the Payment Agreement Proceeds and dealt with them as its own, dissipated them and failed to pay any of them to OCL;

    68.2.   interfered with and/or harmed OCL's business and/or the Claimant, and/or caused or permitted companies under its control to do the same, in the manner stated at paragraph 68.1 above.

69.   In the premises, the First Defendant:

    69.1.   is obliged and/or liable to pay one quarter of the Total Panamax Settlement Sum, alternatively another proportion – to be assessed after disclosure, the making of inquiries and/or the taking of accounts – of the Total Panamax Settlement Sum and/or one quarter of, alternatively another proportion of, the Payment Agreement Proceeds to OCL ("the OCL Claim Amount");

    69.2.   is obliged and/or liable to account to OCL for the OCL Claim Amount;

    69.3.   is obliged and/or liable to pay a sum equivalent to the OCL Claim Amount and/or damages to OCL.

70.   In the premises, the Claimant seeks the following relief:

    70.1.   Declarations of the matters averred at paragraph 69 above;

    70.2.   An order that an inquiry be made, and an account be taken, in relation to the OCL Claim Amount;

    70.3.   An order that the First Defendant do pay and/or procure payment of the OCL Claim Amount or an equivalent sum, and/or damages, together with interest thereon, to OCL.

**Section VIII: entitlement to books and records**

71.    On 11 April 2006, the Claimant and the First Defendant entered into an agreement in writing concerning *"various shipping ventures (the "Ventures")"* ("the April 2006 Agreement"). The First Claimant will refer to the April 2006 Agreement as necessary for its full terms, meaning and effect. The April 2006 Agreement included the following among other express terms:

*"11.    The books and records for the Ventures shall be available for review by representatives of Maroil and LAIL upon reasonable advance written notice to the person in possession of such information."*

72.    On the true construction of clause 11 of the LAIL/Maroil 2006 Agreement and of 14.1 of the VLCC Shareholders' Agreement, and/or by virtue of the duties averred at paragraphs 59 and 63 above, the Claimant is entitled to review all documents, books and records, including bank statements, relating to the Vessels, the PDVSA Contracts, the COA Settlement, the Payment Agreement, the Commission Agreement, the Intercontinental Assignment, the Commission Payment and/or the Payment Agreement Proceeds, which are in the possession of or under the control of the First and/or Second Defendants and/or companies owned and/or controlled by the First and/or Second Defendants and/or their servants or agents ("the Documents").

73.    In the premises, the Claimant is entitled to and claims:

73.1.  An order declaring its right to review the Documents;

73.2.  An order that the Defendants disclose, permit inspection of and on request provide copies of the Documents.

**Section IX: Interest**

74.    Further, the Claimant claims that the Defendants should pay interest, pursuant to section 35A of the Senior Courts Act 1981 and/or the Court's inherent jurisdiction, on all sums, damages and other compensation which the Defendants are ordered to pay or procure payment of, at such rate or rates, for such period or period and so compounded as the Court thinks fit.

AND THE CLAIMANT CLAIMS

(1)   The relief set out at paragraphs 62, 66, 70 and 73 above, including the payment of the interest referred to at paragraph 74 above;

(2)   A declaration of its legal and equitable rights, and the legal and equitable rights of the JV Companies, over and/or relating to the Settlement Proceeds;

(3)   A declaration of its legal and equitable rights, and the legal and equitable rights of the JV Companies, arising out of the Defendants' failure to pay or procure payment of the Settlement Proceeds or any of them to the JV Companies or to the Claimant;

(4)   Such further or other relief as the Court thinks fit.

POONAM MELWANI Q.C.
EMMET COLDRICK

Statement of truth

The Claimant believes that the facts stated in these Particulars of Claim are true.

I am duly authorised by the Claimant to sign this statement.

Signed

Andrew Preston

Solicitor and Partner at Clyde & Co LLP, St Botolph Building, 138 Houndsditch, London, EC3A 7AR, solicitors for the Claimant.

Dated this 1st day of March 2017.

Claim No. _____

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**BETWEEN**

### LATIN AMERICAN
### INVESTMENTS LIMITED

**Claimant**

and

### (1) MAROIL TRADING INC
### (2) SEA PIONEER SHIPPING CORPORATION

**Defendants**

---

### PARTICULARS OF CLAIM

---

Clyde & Co LLP,
St Botolph Building,
138 Houndsditch,
London,
EC3A 7AR.

DX: 160030/London Lime Street 5

T: +44 (0) 20 7876 5000
F: +44 (0) 20 7876 5111

Ref: LVR/AXP/0502080/003

27